**NKC HOSPITALS, INC., Appellant,**

v.

**Dominic ANTHONY, Individually and as Administrator for the Estate of Margaret H. Anthony, Appellee.**

**No. 91–CA–2755–MR.**

Court of Appeals of Kentucky.

March 19, 1993.

C. Alex Rose, Russell H. Saunders, Weber & Rose, P.S.C., Louisville, for appellant.

Frank E. Haddad, Jr., Gary R. Hillerich, Louisville, for appellee.

1. Dr. Hawkins settled the claim of Mrs. Anthony's estate against her prior to the trial of this

Before HUDDLESTON, McDONALD and WILHOIT, JJ.

McDONALD, Judge.

The primal issue in this medical negligence appeal by NKC Hospitals, Inc. is whether the negligence of the hospital was superseded by the negligence of the deceased's primary care physician.

*The Admission to the Hospital*

The decedent, Margaret Anthony, was in her first and only pregnancy under the primary care of Dr. Elizabeth Hawkins, her personal physician and an obstetrician.[1] Mrs. Anthony was in good health, 26 years of age, employed and about 30 weeks along in her non-eventful pregnancy. On the evening of September 5, 1989, Mrs. Anthony was taken by her husband, Dominic Anthony, to the emergency room of Norton Hospital. She was experiencing nausea, vomiting and abdominal pain, and because of her pregnancy, she was referred to the hospital's obstetrical unit.

In the obstetrical unit Mrs. Anthony came under the immediate care of Nurse Rebecca Moore who performed an assessment of Mrs. Anthony. The first concern was whether or not she was in labor. After the preliminary matters were taken care of, Dr. Hawkins was called at about 11:40 p.m. Being advised of the situation, Dr. Hawkins issued several orders, including an IV start, blood work, urinalysis and an anti-nausea prescription.

At about 1:10 a.m., on September 6, a second call was made to Dr. Hawkins giving her the tests results and informing her that Mrs. Anthony was in extreme pain. Believing Mrs. Anthony had a urinary tract infection, antibiotics were ordered along with an order for her discharge from the hospital. At about 1:25 a.m., a third call was made to Dr. Hawkins because of the pain Mrs. Anthony was experiencing, as observed by Nurse Moore. Mr. Anthony also talked with Dr. Hawkins about his wife's pain. At this point Nurse Moore became concerned about Dr. Hawkins' discharge order. Although aware of Nurse

action, and the fact that Dr. Hawkins was negligent was never disputed at trial.

Moore's evaluation, Dr. Hawkins prescribed morphine sulfate but was unrelenting in her order of discharge.

### The Discharge from the Hospital

Dr. Mikael Love, the resident physician on duty, did not see or examine Mrs. Anthony although a prescription for the morphine was ordered and administered pursuant to the telephoned directions of Dr. Hawkins. It is not clear from the record, but we assume the morphine prescription was written by Dr. Love. It was administered to Mrs. Anthony at about 2 a.m. Mrs. Anthony then rested comfortably for several hours, awaking in pain again at about 5 a.m. Nevertheless, she was discharged in that condition at 6 a.m. In trial testimony, Supervisor Nurse Hale admitted that it was a deviation from the standard of nursing care to discharge a patient in significant pain.

Nurse Moore, who was always concerned with Mrs. Anthony's pain, had grave reservations about her discharge in that condition. She suggested that Dr. Love examine Mrs. Anthony. She even consulted her supervisor, Nurse Hale. The major allegation of the hospital's negligence in this case is the undisputed fact that at no time, prior to her discharge, was Mrs. Anthony ever clinically seen or examined by a physician.

### The Re-admission to the Hospital

At about 10 a.m. on September 6, Mrs. Anthony was re-admitted to the hospital. Upon re-admission, Dr. Hawkins began personal supervision of her patient. The events that unfolded are succinctly described in the hospital's brief:

On September 7, it was determined that Mrs. Anthony had a serious respiratory problem, and on September 8, she was transferred to the hospital's intensive care unit. On September 9, the baby was delivered by caesarean section. It was belatedly determined at that time that Mrs. Anthony's condition was caused by a perforation of the appendix at the large bowel, a condition not detected by anyone at the hospital during Mrs. Anthony's first admission. Almost three weeks later, on September 25, 1989, while still in Norton Hospital, Mrs. Anthony died of acute adult respiratory distress syndrome, (ARDS), a complication resulting from the delay in the diagnosis and treatment of her appendicitis.

### The Expert Testimony on Causation

At trial, Dr. Richard Fields, an expert witness for the estate of Mrs. Anthony, board certified in obstetrics and gynecology, testified in no uncompromising terms that the hospital deviated from the standard of care required under the circumstances. The most serious breach of the standard of care required was discharging Mrs. Anthony in the pain she was suffering without having a physician examine her. Pertinent testimony of Dr. Fields is as follows:

Question:

Had Margaret [Anthony] received care at Norton's Hospital which was within, which would have been within the standard of care, what would have been the outcome?

Answer:

She would have had a prompt appendectomy performed following ruling out of various other conditions, such as kidney infection, and the appendix would have been removed, the antibiotic therapy instituted promptly in the intravenous fashion, her dehydrated state would have been corrected, she would never have suffered the pulmonary complication known as acute adult respiratory distress syndrome.

Question:

Within a degree of medical probability, Sir, would she be alive today?

Answer:

Yes.

Question:

Was the discharge of Margaret Anthony from the hospital on the early morning hours of September 6, 1989, a deviation from the standard of care for the hospital?

Answer:

Yes, Sir.

Dr. Fields' testimony tagged Norton Hospital with negligence as its actions were "... below the standard of care for

any institution ...," the reason being as follows:

> Every patient who presents herself to the labor and delivery area, the emergency room, or any area of the hospital, would be seen by a physician before anything is undertaken, and certainly before she is allowed to leave the institution. Furthermore, to provide the patient with medication in the form of a prescription without the physician ever seeing the patient is below any standard I'm acquainted with.

Additionally, Dr. Fields emphasized that, had a doctor or nurse simply listened to Mrs. Anthony's lungs, it would have been revealed by the "diminished breath sounds" that she had a condition which would rule out her discharge. The conditions of her lungs eventually led to her developing the acute respiratory distress syndrome from which she died.

### The Jury Instructions and Verdict

The jury was instructed on the comparative negligence of Dr. Hawkins and Norton's Hospital. An award of $2,265,923.70 was returned with an apportionment of causation attributable to Dr. Hawkins as 65 percent and Norton Hospital as 35 percent. Because the claim against Dr. Hawkins was settled prior to trial, judgment was entered solely against Norton Hospital for $793,073.29. An amended judgment was entered, reducing the award to $780,265.83, by voluntarily deleting the award of medical expenses upon the motion of the estate of Margaret Anthony.

### The Hospital's Argument

Norton Hospital argues that the trial court erred in failing to grant its motions for directed verdict and for judgment notwithstanding the verdict because of the lack of substantial causation in linking the negligence of the hospital to Mrs. Anthony's death. The hospital's rationalization is based on the testimony of Dr. Fields, the only expert witness on causation, that no negligence was committed by the hospital after Mrs. Anthony's re-admission on September 6, 1989; that Dr. Hawkins had from the time of re-admission until midnight on September 7, 1989, to properly treat and diagnose Mrs. Anthony; and Dr. Hawkins

continued to handle Mrs. Anthony negligently even after the re-admission. The hospital contends that Dr. Hawkins' conduct became the superseding cause of Mrs. Anthony's death, thereby breaking the chain of causation and cutting short the negligence and liability of the hospital.

### The Opinion of the Court

■ The question at issue puts us to the task of an in-depth discussion and review of causation and superseding cause. The hospital's negligence is based on acts of omission, by failing to check Mrs. Anthony's lungs or to have her examined by a physician, and on positive acts of negligence, such as discharging her in pain. Negligence may rest on an omission as comfortably as positive acts; the consequence is the same. "It must be admitted that negligence, as a basis of civil liability, imports absence of care in performing an act or an omission or failure to do something that ought to have been done." *Meeks Motor Freight v. Ham's Adm'r*, 302 Ky. 71, 193 S.W.2d 745 (1945). Dr. Fields' opinion evidence supplied the cause in fact and, with such evidence, anyone impartially reviewing this record would agree that the hospital was negligent in its care of Mrs. Anthony. Even the hospital's defense of Dr. Hawkins' superseding cause presupposes, ipso facto, negligence on its own behalf.

In our journey of review of the hospital's defense, we first visit with William L. Prosser, *Law of Torts*, (4th ed. 1978). Prosser uses the descriptive phrase "intervening cause" or "intervening force" as opposed to "superseding cause" as used by the *Second Restatement of Torts*, § 440.

Prosser writes at page 272:

In the effort to hold the defendant's liability within some reasonable bounds, the courts have been compelled, ... to fall back upon the scope of the original foreseeable risk which he has created. The question is always one of whether he is to be relieved of responsibility, and his liability superseded, by the subsequent event.... It is therefore said that the defendant is to be held liable if, but only if, the intervening cause is "foreseeable."

A superseding cause is an intervening independent force; however, an intervening cause is not necessarily a superseding cause. We say that, if the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause. Such train of thought is in keeping with *Deutsch v. Shein,* Ky., 597 S.W.2d 141 (1980). *Deutsch* established: "Liability for a negligent act follows a finding of proximate or legal cause," which is conduct based on a substantial factor in bringing about the harm. *Deutsch* relied on *The Restatement of Torts, Second,* § 431.

Our review is not only of Prosser and the *Restatement,* but also the authorities hereinafter cited, in coming to the conclusions we express. The task is not eased by the inconsistent and convoluted terminology used by the writers. The authorities relied on are: *Montgomery Elevator Co. v. McCullough,* Ky., 676 S.W.2d 776, 780 (1984), [uses intervening cause synonymously with superseding cause, saying the facts must be " 'extraordinary rather than normal,' or 'highly extraordinary' in nature, unforeseeable in character, as to relieve the original wrongdoer from liability"]; *Peterson v. Bailey,* Ky.App., 571 S.W.2d 630, 632–633 (1978), ["it is only when (acts) are *so utterly foolhardy and extra ordinary* that they cannot be regarded as any normal part of the original risk, that they will be considered a superseding cause" (emphasis original)]; *House v. Kellerman,* Ky. 519 S.W.2d 380 (1975), ["to begin with, literally speaking, there can never be only one 'cause' of any result"]; *Britton v. Wooten,* Ky., 817 S.W.2d 443 (1991), [acts of arsonist not superseding cause where tenant piled trash next to building]; *Siggers v. Barlow,* 906 F.2d 241 (6th Cir.1990), [facts similar to case at hand, results incongruous to ours herein]; *Henry v. Merck and Co. Inc.,* 877 F.2d 1489 (10th Cir.1989), [*supervening* cause as opposed to superseding cause—distinguishes between creating negligent condition as opposed to a cause]; *Long v. Ponca City Hospital, Inc.,* 593 P.2d 1081 (Okla. 1979), [negligent act that merely creates a condition; if result of act not foreseeable, the negligence furnishes only a condition, such as leaving keys in a car's ignition; illegally parking a car; operating a car without sufficient gasoline, causing it to stall, etc.]; *Carlotta v. Warner,* 601 F.Supp. 749 (E.D.Ky.1985), (Bertelsman), ["superseding cause involves the negligence of a third party or the intervention of some natural force"]; and *Landeros v. Flood,* 17 Cal.3d 399, 551 P.2d 389 (1976), [an intervening act does not amount to a superseding cause if it was reasonably foreseeable].

In summation of the authorities we have considered a superseding cause will possess the following attributes:

1) an act or event that intervenes between the original act and the injury;

2) the intervening act or event must be of independent origin, unassociated with the original act;

3) the intervening act or event must, itself, be capable of bringing about the injury;

4) the intervening act or event must not have been reasonably foreseeable by the original actor;

5) the intervening act or event involves the unforeseen negligence of a third party [one other than the first party original actor or the second party plaintiff] or the intervention of a natural force;

6) the original act must, in itself, be a substantial factor in causing the injury, not a remote cause. The original act must not merely create negligent condition or occasion; the distinction between a legal cause and a mere condition being foreseeability of injury.

By now it is clear that foreseeability by the original or antecedent actor (herein the hospital) negates an otherwise superseding cause (Dr. Hawkins), which means the hospital is left on the liability hook. In analysis, the hospital certainly should have foreseen the injury to Mrs. Anthony because its own staff was questioning the judgments of Dr. Hawkins, while at the same time failing to follow through with the standard of care required of it. All qualified health care providers, within the range of care for Mrs. Anthony,

were under a duty to exercise their senses and intelligence to investigate and inspect for potential dangers to her. They did not. Their voluntary ignorance of her condition will grant no relief because voluntary ignorance is negligence. Knowledge and the opportunity to acquire knowledge of the peril and risks involved were the fundamental basis of the duty owed to Mrs. Anthony. *See Meeks Motor Freight, supra.* The defense that the hospital's nurses were only following a "chain of command" by doing what Dr. Hawkins ordered is not persuasive. The nurses were not the agents of Dr. Hawkins. All involved had their independent duty to Mrs. Anthony.

Our conclusion is that § 442 B. of the *Restatement of Torts, Second* satisfies our inquiry whether to hold the hospital liable. It states:

Where the negligent conduct of the actor [here, the hospital] creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force [here, Dr. Hawkins] does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

The hospital's superseding cause argument pales when considering the statement in *Deutsch* that, "injury need only flow directly from the event." The hospital, in our opinion, could readily foresee that injury would directly flow from Dr. Hawkins' negligent conduct, and the hospital had all the time and means in which to correct it.

■ Superseding causation, as such, is never submitted to the jury, *House v. Kellerman,* and *Britton v. Wooten, supra,* except to the extent that its elements are already incorporated in the comparative fault instructions as simply negligence. Here, the trial court ruled that Dr. Hawkins' negligence was not a superseding cause. Then, the jury found that Dr. Hawkins' negligence was 65% of the cause of Mrs. Anthony's death. Had the jury found 100% of the cause attributable to Dr. Hawkins, in effect, they would have said Dr. Hawkins' negligence was a superseding cause.

The trial court did not err in overruling the motions for directed verdict and motion for judgment notwithstanding the verdict. *See Humana of Kentucky, Inc. v. McKee,* Ky.App., 834 S.W.2d 711 (1992), and *Lewis v. Bledsoe Surface Mining Company,* Ky., 798 S.W.2d 459 (1990).

Next in order, the hospital claims the trial court committed reversible error when it failed to sustain its motion for a new trial, on the grounds:

A) The award of compensatory damages for pain and suffering was clearly and grossly excessive;

B) The appellee's proof was insufficient to support an award for medical expenses;

C) The verdict is not sustained by sufficient evidence and is contrary to law.

■ The hospital's argument is vigorous in assailing the award of $1,625,000 (or $81,000 per day) for 20 days of pain and suffering; that such an award by any device of measurement would indicate a result solely based on passion and prejudice. The hospital likens the award to a "California" type verdict. Although granting that Mrs. Anthony did suffer severe pain, it argues there were times when she was pain free and not complaining of discomfort; there were days that she was doing better; that during the last, Mrs. Anthony was in a coma. It is urged that we say the award was grossly excessive and not supported by the evidence.

Antithetically, the evidence was of a woman conscious of her last days on earth, swollen beyond recognition, tubes exiting almost every orifice of her body, in severe pain, and who deteriorated to the point where she could not verbally communicate with loved ones. Among the last things she did was write out instructions about the care for her newborn child.

The trial court, when confronted with a motion for a new trial under CR 59.01(d) on excessive damages, must evaluate the award mirrored against the facts. It is said, if the trial judge does not blush, the award is not excessive. On the level before us, we only determine whether the trial court erred. No question, the award

was monumental but so was the injury. Clearly, the relationship between the award and the injury in this case is not bizarre. The factual basis supporting the award convinces us there was no error or abuse of discretion in the denial of a new trial on this ground. *See Davis v. Graviss*, Ky., 672 S.W.2d 928 (1984).

The error asserted by the hospital regarding the medical expenses is a non-issue on appeal. The trial court erred in submitting all of the medical expenses to the jury. The trial court commingled the expenses for the total treatment of Mrs. Anthony, including the pregnancy care, birth, and so forth. In an avoidance of error, the estate in an amended judgment remitted the total award for medical expenses. In our opinion that makes this claim of error moot.

The last issue, that the verdict is not supported by sufficient evidence, is groundless; we affirm, without discussion, except for such reasons otherwise given herein.

The judgment of the Jefferson Circuit Court is affirmed.

HUDDLESTON, J., concurs.

WILHOIT, J., dissents and files a separate opinion.

WILHOIT, Judge, dissenting.

While I agree that the damages awarded in this case were not excessive, I respectfully dissent from the majority on the question of liability. There was ample evidence presented in this case to support a finding that the appellant hospital acted negligently toward Mrs. Anthony. I believe, however, this negligence was not a substantial factor in causing her tragic death because of the intervening negligence of Dr. Hawkins.

There was no evidence of any negligence by the hospital beyond that which occurred in the early morning of September 6 when it permitted Mrs. Anthony to be discharged without an examination by a medical doctor. According to the testimony of the appellee's expert, such an examination would have led inevitably to the discovery that Mrs. Anthony needed abdominal surgery. He believed that if her appendix had been removed in due course and antibiotic therapy begun, she "would be alive today."

He also stated that until her infected appendix was removed, her condition would only have continued to deteriorate. In his opinion, if her appendix had been removed by 11:59 p.m. on September 7, her recovery would have been assured. After that time her chances for recovery lessened as time passed. This expert believed that a qualified obstetrician/gynecologist, as was Dr. Hawkins, ought to have been able to ascertain within three hours that Mrs. Anthony needed surgery.

Mrs. Anthony returned to the hospital at approximately 1:00 p.m. on September 6 and from that time on was under the care of Dr. Hawkins, who should have been expected to realize the need for surgery by around 4:00 p.m. on that day according to the expert. It is undisputed that the hospital did not act negligently after Mrs. Anthony's return. There is no testimony, for example, indicating that the hospital knew or should have known that Dr. Hawkins was acting negligently in the care being given to Mrs. Anthony after her return. Thus, from the time of Mrs. Anthony's return to the hospital until well after it was too late to save her, the hospital had no reason or right to interfere with Dr. Hawkins's control of the treatment being given to her patient.

Inasmuch as Mrs. Anthony's care was under the exclusive control of Dr. Hawkins after her return, and from that time there were still at least 32 hours in which to make a decision which should take only about three hours to make if Dr. Hawkins had acted properly, it seems to me the negligence of Dr. Hawkins superseded that of the hospital and was the legal cause of Mrs. Anthony's death. This case appears to me to fall squarely within the rule enunciated in § 452(2) of the *Restatement (Second) of Torts* (1965).